Matter of George D. (2003 NY Slip Op 51722(U))

[*1]

Matter of George D.

2003 NY Slip Op 51722(U)

Decided on April 30, 2003

Family Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 30, 2003

Family Court, New York County
In the Matter of the Adoption of GEORGE D., 
 by DIANA B., Petitioner.
Docket No. A4958/01

Susan R. Larabee, J.
On May 9, 2001, this court received the Petitioner Diana B.'s application to adopt the subject child, George D. (d.o.b. 12/20/86). Ms. B. was born on January 4, 1948, and is the child's maternal great aunt. George was freed for adoption by an order signed by this court on August 25, 1998, but the adoption petition was not filed until May 9, 2001. George has resided in Ms. B.'s home since October 23, 1991.
Upon careful review of the adoption petition, the materials contained in the adoption file, as well as the many records and information which this court obtained from courts in Westchester County, this court finds that the information contained in these records is quite troubling, and that Ms. B.'s petition to adopt must be denied as not being in the child's best interests.
It should be noted that this decision amplifies this court's bench ruling issued on December 19, 2002.
 The homestudy provided to this court was dated December 31, 1998,[FN1] and described Ms. B.'s general background. Ms. B.'s mother was a teenager when she was born, and mother and daughter apparently "never bonded" (Homestudy, at 7, File). Ms. B.'s father was said to be a "presence throughout her life, visiting with her often, 'when he wasn't in prison'" (id.), and that Ms. B. was raised by her maternal grandparents. Ms. B. left high school at the age of 15 when she became pregnant with her first child, Spencer, Jr. (d.o.b. 6/4/63). The father of her child, Spencer Jackson, was 14 years old at the time, and was never an active presence in his child's life.
Four years later, Ms. B. moved in with James N., who became the father of her daughter, Lisa (d.o.b. 6/12/68), and son, Lasean a/k/a Sean (d.o.b. 8/27/74). Due to Mr. N.'s infidelity, Ms. B. left him and then moved in with Jesse B.. They got married in 1975, and he subsequently passed away in 1996. Mr. B. was HIV positive, and Ms. B. reported that she had not had physical relations with him "for many years previous to his diagnosis with HIV because of his [*2]choice of lifestyle" (Pet's Aff [6/26/01], File).
According to the homestudy, Spencer was currently married and employed as a sanitation worker, Lisa was married, and Lasean was incarcerated on drug charges.[FN2] No other children or adults, aside from Ms. B. and the subject child, were said to reside in the household. Indeed, the homestudy described the fact that Ms. B. lives in a three-bedroom apartment where she and George each have their own bedroom, and that the extra bedroom "used to belong to Ms. B.'s youngest son, Sean, and is now used for storage" (Homestudy, at 5, File). The only mention made of any other children who had resided in the home was made by an individual who served as Ms. B.'s adoption reference. She told the caseworker that Ms. B. "has stepped in and helped with the raising of four of her other nieces and nephews, taking them into her home for periods of time" (Homestudy, at 12, File). The agency made no attempt to provide any information as to these children who had allegedly been in Ms. B.'s care.
The adoption file did, however, contain information that Ms. B. was the subject of an indicated report with the State Central Register of Child Abuse and Maltreatment (SCR).[FN3]
The intake report states that on September 7, 1993 Ms. B. "punched the child [Charlene D. d.o.b. 1/24/79] in the left eye causing her eye to be black and blue, and the aunt tried to hit the child...with a piece of wood out of anger...because she came home late. This incident took place at 12:01 a.m. this morning" (Intake Report [dated 9/7/93], File). The investigation summary revealed that the case was deemed "indicated" and that allegations that Charlene sustained lacerations, bruises, and welts were substantiated. According to the report, Ms. B. "admitted that she hit [the] child. Child Charlene was observed, she had a black eye" (CPS Investigation Summary, at 4, File). Charlene was sent to her grandmother's home and, thus, was deemed "out of risk" (id.). The intake report also noted that 4 other children resided in the household (Lasean B., George D., Lamont D., Jr., and Walter D.). While the results of the investigation revealed that "there is enough evidence to substantiate this report" and that "this case therefore is being indicated," it was still determined without explanation that "the family did not require any further services" (id.).
An agency affidavit prepared as part of the adoption file states that Charlene apparently came home after midnight "after being out with an adult male and allegedly engaging in sexual activity" (Dummit Addendum to Affidavit of Agency Investigation [dated 11-21-00], File). When Ms. B. confronted Charlene, Charlene was allegedly "uncontrollable" and struck out at Ms. B. "who in turn slapped not punched the child on or about her face causing the bruise" (id.). Ms. B. denied that she attempted to strike Charlene with a "stick, two by four, or any other object" (id.). The agency accepted Ms. B.'s regret over the incident, and stated that it continued [*3]to recommend that the instant adoption be finalized.
The adoption file also contained information that three years after the indicated case against Ms. B., on June 22, 1996, Ms. B. herself called in a report against her son, Lasean B. (8/27/74), and his girlfriend, Jacqueline L. (1/1/77), regarding their child, Disean L. (5/9/96), all of whom were residing in Ms. B.'s home. According to the intake report, Ms. B. alleged that "Jacqueline seems incapable of caring for Disean. She doesn't know how to feed the baby and he keeps choking and turns red. He was also ill for about 4 or 5 days with a fever. Diana had to persuade Jacqueline to take the baby to the hospital. Jacqueline was given a prescription to get for Disean, but she failed to have it filled for 2 days. He has an infection in his mouth. Jacqueline and Lasean were having sex while Jacqueline was holding Disean. She was laughing about him shaking while they were having sex. The reporter didn't know whether or not the shaking was severe enough to hurt the child" (Intake Report [dated 6/22/96], File). The report also said that Jacqueline returned to her mother's home that night. No reports regarding a follow-up investigation were provided.
Based on these reports, this court wrote a letter on May 16, 2001 asking for, among other things, additional information regarding the 1996 case against Jacqueline L. and Lasean B.,[FN4] all the records and reports regarding the 1993 indicated case against Ms. B., and details regarding the other children who were apparently in the home at the time of the 1993 incident (see Court Atty Ltr [dated 5-16-01], File).[FN5] On June 18, 2001, this court appointed Eugene Fastook, Esq. as the subject child's Law Guardian.
In response, this court failed to receive any notes, records, or reports regarding the 1993 indicated case against Ms. B.. The caseworker's affidavit merely states that "[t]here is no reference in the case record relative to the September 7, 1993 incident, or to the worker, or [*4]agency assigned to this case at that point in time" (Dummit Aff [dated 6/20/01], File).[FN6]
With respect to the children in Ms. B.'s home at the time of the 1993 report, the caseworker reported that (1) Lamont D. (d.o.b. 6/2/81) resided in Ms. B.'s home until he was 18, and that he then decided to live with his father; (2) Charlene D. (d.o.b. 1/24/79) resided in Ms. B.'s home for about one year after the 1993 incident, and then moved in with her father; (3) Walter D. (d.o.b. 1/18/78) resided in Ms. B.'s home until he was 20, and then decided to relocate to Oklahoma, (4) Ms. B.'s biological son Lasean (d.o.b. 8/27/74), resided with her until June 2000 and then moved in with his girlfriend, and (5) Lorraine D. (d.o.b. 8/1/77) resided with Ms. B. until she was 21, and then acquired her own apartment (id.).[FN7]
With respect to the 1996 report Ms. B. herself called in, she submitted an affidavit saying that the Lasean in that case was her son, and that the "indicated case against Lasean in 1996 involved his request to Jacqueline L. to move from my home at my request because of her behavior. She was very angry with him and made accusations about him concerning both her and their son, Disean L.. The case was dismissed and at present, Lasean, Jacqueline, and Disean live together as a family" (Pet's Aff [6-26-01], File). Quite obviously, Ms. B.'s affidavit directly contradicts the information contained in the intake report made in 1996.
With so little information provided by the agency, and contradictory information provided by Ms. B., this court was forced to track down and request copies of records from Westchester County Family Court which revealed that in 1989 Ms. B. had actually obtained a final order granting her custody of her nieces/nephews: (1) Lorraine D. (d.o.b. 8/2/75), (2) Walter D. (d.o.b. 11/18/77), (3) Charlene D. (d.o.b. 1/24/79), and (4) Lamont D., Jr. (d.o.b. 6/7/81) (Westchester County Family Court [Lefkowitz, J.] [dated 9/6/89] [Docket Nos. V2379-85/88]).
Records this court obtained from Yonkers County Family Court also revealed that, while residing with Ms. B., Lamont D., Jr. was arrested on February 9, 1995 for (1) sexual abuse 1st degree, class D felony, 2 counts, (2) sexual abuse 2nd degree, class A misdemeanor, 2 counts, and (3) sexual abuse 3rd degree, class B misdemeanor, 2 counts. The "Pre-dispositional/Pre-plea/Pre-sentence Investigation Report" states that Lamont pled guilty to the two counts of sexual abuse, 1st degree. The probation report, however, states that the Hon. Ingrid S. Braslow held a trial and [*5]sustained the 2 counts of sexual abuse in the 1st degree, but dismissed the other charges (see DiCarlo Probation Report [not dated], File).
Lamont was subsequently arrested again one month later on March 7, 1995, and charged with (1) attempted assault, 2nd degree, (2) criminal mischief, 4th degree, (3) criminal possession of a weapon, 4th degree, and (4) unlawful possession of a weapon by persons under 16. Following a trial, Judge Braslow rendered a decision whereby all charges were sustained beyond a reasonable doubt (see "Pre-dispositional/Pre-plea/Pre-sent. Investigation Report, File). According to the probation report, Lamont said that he "pulled out a razor that a friend gave me and swung it at [the victim]" (DiCarlo Probation Report [not dated], File).
The files received from Yonkers, which purportedly contain the complete record of this matter, do not reveal the ultimate disposition (see Court Certification of Records [dated 8/20/02], File). The probation report does, however, include information that Ms. B. told the probation officer that Charlene had been voluntarily placed into foster care for one year but was now with her parents and, inexplicably, that the subject child of this adoption proceeding , George, "is the only child born" to her and her husband, Jesse (DiCarlo Probation Report [not dated], File [emphasis added]).
While it is not clear when Charlene was placed into foster care or by whom, separate records reveal that Eveline D., Ms. B.'s mother, sought custody of Charlene D. after the 1993 SCR incident because "Charlene wishes to live with me and is doing so temporarily with everyone's agreement" (Pet [dated 9/16/93], quoted in Probation Report [dated 10/28/93], File).
During her interview with the probation officer investigating the custody case, Ms. B. stated that at the time of the 1993 incident, Charlene was 14, on probation for assaulting a girl, and that her boyfriend was someone who was selling drugs. When Charlene came home at 12:00 a.m., Ms. B. "grabbed Charlene, who was disrespectful to her. After Charlene started kicking Mrs. B., she stated that then 'I knocked the hell out of her'" (Probation Report [dated 10/28/93], supra, at 3). Ms. B. also stated that "she would do it again if Charlene behaved in such a disrespectful manner" (id.) .
During the probation officer's interview, Ms. B. also provided troubling information regarding the other children that had been in her home. Regarding Lorraine D., Ms. B. informed the probation officer that she had "asked Lorraine to leave [her home] after [Lorraine] became pregnant. According to Ms. B., the father of this child is the neighborhood drug dealer" (id. at 2).
In discussing her biological son, Spencer, Ms. B. said that Spencer was "drug addicted, but has been sober for the past ten years," and "described an incident in September 1983 where Spencer was high on angel dust. He attempted to hit her and she stabbed him with the knife that she was using to prepare dinner" (id. at 2).
With respect to her son Lasean, Ms. B. admitted to "burning her son's bed last year after [*6]she learned that he was selling drugs" (id. at 2).
The probation report recommended that Charlene's grandmother be granted temporary custody, and on November 29, 1993, the Hon. Joan Cooney ultimately granted Eveline D. permanent custody of Charlene D. (Westchester County Family Court Order [dated 11/29/93], File).
As such, neither Ms. B.'s statement to the probation officer involved with Lamont's case that Charlene was living with her parents (see DiCarlo Probation Report, supra), nor the caseworker's affidavit that Charlene had remained with Ms. B. for a year and a half after the 1993 incident and then moved in with her father (see Dummit Aff [6/20/01], supra), appears to have been correct.[FN8]
Still more confusing and conflicting information was provided during the course of the interview conducted by the Law Guardian's social worker, Stuart Levinson, for purposes of this adoption proceeding. First, Ms. B. apparently incorrectly stated that she had adopted her biological son, Lasean B.. She also said that Lamont D. was placed in her home by ACS and "uses marijuana, but no longer abuses drugs" (Levinson Report [dated 2/5/02], File), and that he only lived with Ms. B. from May 1998 through the summer of 2000. However, the SCR reports for the 1993 indicated case against Ms. B., as well as Lamont's juvenile delinquency records and the caseworker's recent affidavit all stated that Lamont had lived in Ms. B.'s home until he turned 18, which would have been in 1999 (see Dummit Aff [dated 6/20/01], supra), thus demonstrating that Lamont had actually been in Ms. B.'s home for years longer than the two-year period Ms. B. reported to Mr. Levinson.
Ms. B. also apparently told Mr. Levinson that the whereabouts of Walter D. were unknown, which conflicts with the caseworker's affidavit that Walter was known to be currently residing in Oklahoma (see Dummit Aff [dated 6/20/01], supra).
With respect to the 1993 SCR report, Ms. B. informed Mr. Levinson that Charlene was "accidentally hit in the eye" (Levinson Report [dated 2/5/02] [emphasis added]), which directly contradicts the CPS investigation report which found that Ms. B. admitted that she hit Charlene (see CPS Investigation Summary, supra), as well as Ms B.'s statements to the caseworker that she slapped the child (see Dummit Aff [dated 11/21/00], supra), and her comments to a probation officer that she "knocked the hell out of [Charlene]" (Probation Report [dated 10/28/93], supra).
Perhaps most surprisingly, Ms. B. also informed Mr. Levinson that another foster child, Nathaniel Favor (d.o.b. 8/12/85), currently resided in her home. This court never received any notification from the agency that another child had been placed into Ms. B.'s care and still, to date, has never received any information regarding this child.
[*7]
Ms. B.'s puzzlingly contradictory statements extend to information she has provided regarding a large sum of money she allegedly received. The issue appears to have first arisen during the course of her interview with the social worker, Mr. Levinson. His report included information that she was in possession of "$75,000, from a personal injury settlement, situated in her sister's savings account" (Levinson Report [dated 2/5/02], File [emphasis added]). Two months later, Ms. B. submitted an affidavit to the court stating that "upon the death of my husband, Jesse B., on February 21, 1996 [I] was the beneficiary of insurance policies totaling $75,000.00. When I received the money I subsequently transferred $21,000 to my three (3) adult children, to wit: Spencer B., Lisa B. and Lasean B. each were given $7,000.00. I gave Social Security $24,000.[FN9] I spent approximately $30,000.00 on furniture, outstanding credit card bills, rent arrears, phone arrears, clothing, gifts especially to my four new grandchildren including baby furniture, and trips including to Las Vegas and the Bahamas" (Pet's Supplemental Aff [dated 4/16/02], File [emphasis added]). At the hearing on the very same date that Ms. B. signed this affidavit, Ms. B.'s attorney, Lynn Graham, Esq., informed the court that Ms. B. had received $75,000.00, and that this entire amount had been spent as described in Ms. B.'s affidavit (Transcript [4/16/02], at 3). Ms. B., however, testified that she had received a $75,000.00 settlement for injuries she sustained from a car accident, but that the "State has not released the check" (id. at 4), thus putting into question her affidavit that she had received and spent the money. Ms. B. alleged that "I was waiting for a lighta car hit me on a rainy day after I had delivered a container of melting (sic) to senior citizens, one of my tenants" (id.). She then said that she had received another settlement because "a non-man-of-color called me a I can't remember well, a caucasian gentleman, a Metro North employee, at the time said to me that I was a liar, that I didn't purchase my ticket that day, detained me with a police officer for 57 minutes and the State Supreme Court judge gave me $53,000 for him being there because I have never been in trouble before, and it was a very bad scene" (id. at 5). When this court asked Ms. B. if the money was in her sister's savings account, as she had explained to the social worker, Ms. B. replied that "I don't have a sister my sister is crack addicted" (id. at 5). She then admitted that she does, in fact, have a sister, but that "she's not in my life" and that she did not put any money into anyone else's bank account (id. at 5).
 Ms. B. has also not been fully forthcoming to this court regarding the involvement she and her family members have had with the court system.
When asked by the caseworker whether she or her family members had any involvement with criminal court or problems involving domestic violence or mental illness, Ms. B. reported that she had been arrested twice in her lifetime: once for an unpaid parking ticket, and once for disorderly conduct. She claimed that both charges were dropped (Homestudy, at 8, File; see also Levinson Report [dated 2/5/02], File [where Ms. B. claimed that the charges were dismissed]). Ms. B. also told the caseworker that she had been hit by Mr. N., the father of her children Lisa and Lasean, and also by her husband, Mr. B.. She stated that with the exception of one brother, [*8]her four other siblings were all involved with substance abuse. She also admitted that Lasean was incarcerated on a drug charge at the time the original homestudy was completed on December 31, 1998.
The rap sheet this court obtained, however, reveals that Ms. B. was actually convicted on a plea of guilty to the charge of disorderly conduct on February 28, 1983 (see Criminal Rap Sheet).
Moreover, the domestic violence registry check completed by this court on May 9, 2001 revealed that Ms. B. had obtained an order of protection against her nephew, Lamont D. (d.o.b. 6/7/81), on May 5, 1998 in Westchester County Family Court (Jamieson, J. [Docket No. O-02702-98]). The petition states that "Lamont completed probation in [January 1998]. Two weeks after he ran away and has been staying with 'friends.' In February he entered my house and removed $100 from my drawer. Also in February he took the benefit money that I was going to return to DSS He took my keys and now is threatening my 11 year old nephew [George] with bodily harm" (Petition [6/8/98], File). When asked about this order, Ms. B. admitted that she had obtained an order of protection against Lamont "because he stole money from me in order to support and be with an older woman of whom I disapproved" (Pet's Affidavit [6/26/01], File).
Additional records reveal that Ms. B. had obtained an order of protection against Lamont D., Sr., as well, to prevent him from harassing Ms. B. and to prevent him from removing Lorraine, Walter, Charlene, and Lamont, Jr. from her care (Westchester County Family Court [Spitz, J.], [dated 5/27/88], File).
Also missing from Ms. B.'s statements to the caseworker is the fact that Ms. B. was the respondent in a domestic violence matter which was commenced by Jacqueline L. (d.o.b. 5/10/77) on behalf of her child Disean L. (Westchester County Family Court [Docket No. O-03269/00] [Addles, J.], File). Ms. L. alleged that Ms. B. came to her apartment and "started to scream, yell and curse. She put me down, and said I was an unfit mother...In July 1996 Diana tried to physically take my son away from me, and she pushed me repeatedly. Diana has been calling my house at least five times a day for over a week, threatening to take my son from me....I want Diana to stay away from me" (Petition [dated 12/11/00], File). The order directed Ms. B. to stay away from Disean except with the permission of his mother, stay away from Disean's school, and refrain from assault against Disean.
It is interesting to note that this Jacqueline L. is the girlfriend of Ms. B.'s son, Lasean, who had been living with Ms. B. and was named, along with Lasean, as subjects of the 1996 SCR report called in by Ms. B.. In addition, except for a slight discrepancy in the birth date, Jacqueline L. appears to be the "Jackie L." (d.o.b. 5/10/75) who is currently named in the homestudy as the subject child's babysitter and back-up resource (see Homestudy, at 11, File).[FN10]
[*9]
Just one month prior to obtaining the order of protection against Ms. B., Ms. L. had also filed for an order of protection against Lasean, claiming that he physically abused her "too many times to count" and that she had "lived in fear of Lasean for quite some time. He has a history of drug involvement, both usage and sales, and is very volatile in nature" (Petition [dated 11/28/00], File). No order, however, was contained in the records sent from Westchester County Family Court.
It should also be noted that the probation report prepared in connection with Ms. B.'s petition to obtain custody of her half-brother Lamont D.'s children included Lamont D.'s statement that Ms. B. had attempted suicide in the early 1960's, and that she made another attempt in 1967 at which time she was hospitalized. Lamont D. also claimed Ms. B. had a bad temper, which had resulted in several arguments with the police. The probation officer recommended that Ms. B. undergo a psychiatric evaluation (Probation Report [3-22-89], 8-9, File). No information exists in the records this court received that such an evaluation was either ordered or completed.
But perhaps the most troubling information this court has become aware of is the fact that Ms. B. currently lives with a man, Hildred T., whom she has known since she was 16 years old and has apparently been dating for several years, who was never mentioned by the agency as someone involved in her and the child's life, and who has an extensive criminal history the full extent of which this court, despite rather strenuous efforts, has still not been able to discern. Only after the social worker, Stuart Levinson, submitted his report on February 5, 2002
 almost one year after the adoption petition was originally filed  did the fact that Ms. B. even has a paramour come to light. On that date, this court ordered the agency to provide a State Central Register report and OCFS (Office of Children and Family Services) criminal history report to this court.
During Mr. Levinson's interview with Mr. T., Mr. T. apparently admitted that he served 12 years in prison for a manslaughter conviction, and that his parole will not end until 2005. He also admitted to "an extensive criminal history, involving drugs, guns, violence, etc., but no sexual/abuse offenses regarding children or young people" (Levinson Addendum to Report [4/15/02], File). He also admitted that Ms. B. had previously filed a domestic violence complaint against him in 2000 due to a "verbal altercation" which resulted in "5 or 6 court appearances," but that it ultimately resulted in a "dismissal of the charge(s) at the request of Ms. B." (id.).[FN11] [*10]Ms. B. apparently told Mr. Levinson that she was aware of Mr. T.'s criminal history, that they have been dating for 3 years, that he is employed as an HIV counselor with Greystone Health Center, and that he has a masters degree in "professional studies" from the New York Theological Society (Levinson Reports [dated 2/5/02 and 4/15/02], File).
Mr. Levinson also spoke with Mr. T.'s probation officer who said that Mr. T. did not have any parole violations, but "recommended that [Mr. Levinson] be circumspect in this adoption case, regarding Mr. T., and that [Mr. Levinson] recommend a reevaluation of the case, in 6 months, to make sure that the current circumstances and situation remain the same. He is aware that Mr. T. has a Masters Degree, and, he feels that, currently, Mr. T. is no risk to the child(ren) in question, but, that the atmosphere back in the year 2000 was not so good" (Levinson Report [dated 4/15/02], File). Mr. Levinson later testified that "I think he meant that there was some discord in the home environment, that there were verbal altercations and arguments that were taking place" (Transcript [4/16/02], at 10, File).
At the hearing held on April 16, 2002, the court and Ms. B. engaged in the following colloquy (Transcript [4/16/02], at 6-7, File):
Court: Apparently Mr. T. has quite a criminal record. Were you aware of that?
Ms. B.: I was aware of Mr. T.'s record when he was sixteen years old.
Court:Was that a manslaughter conviction?
Ms. B.:It didn't turn out to be manslaughter. It was a manslaughter in 1978my daughter sends letters. George sends letters Mr. T. has turned his life around tremendously. He works for the youth term.
Court:What do you know about the manslaughter conviction?
Ms. B.:It was a drug deal gone bad.
Court:Did he kill someone?
Ms. B.:I don't know. I wasn't there, ma'am.
Court:Did you ever ask him?
Ms. B.:Yes.
Court:What did he say?
Ms. B.:He told me that he didn't.
Court:Did he explain why he served seven to twelve years in prison?
Ms. B.:Because it was a friend of his who testified against him, and it's in the court record.
Court:Did he tell you about any other problems?
Ms. B.:Yes, he did. He told me about his drug possession. He told me about his gun possession. He also told me that nobody sat down and stopped his father from beating him to death, and he was very angry at the time he told me everything.
[*11]
Ms. B. also testified that she first met Mr. T. when she was 16 years old, when her mother "used to have a restaurant....A lot of people used to familiarize themselves, Nikki Barnes all of those people that lived in Harlem and she [sic] called her mom" (Transcript [4/16/02], at 7, File). Ms. B. also said that Mr. T. "was a very destructive man at that time. I would not have dealt with Mr. T." (id.).
When asked about the domestic violence case she initiated but later dropped against him in 2000, Ms. B. claimed that she had lied about Mr. T. hitting her, and that he is "one of the most respectable sweetest men you could meet" (id. at 8).
While Ms. B. did not testify as to when she and Mr. T. became reacquainted, she did state that they now see one another "every single day" and "practically" live together (id. at 10). She described how each day the subject child goes to meet Mr. T. at his place of employment at 4:30 p.m. The child then "play[s] with the computer until Mr. T. gets finished" (id. at 15). They then drive from Yonkers to 125th Street where they pick up Ms. B. after she finishes her work. Three days a week they then drive to Brooklyn, where "we run groups around an hour then. We'll take the kids for recreation for around an hour usually no later than 8:30" and do homework (id. at 15). They then return home to Yonkers.
She also testified that Mr. T. asked her to quit the second job she had at Children's Village "[b]ecause he wanted me to come home and cook and he thought it was too much for me. He didn't want me to work two jobs" (id. at 12), and that Mr. T. pays her $6,000 per year to type 12 reports and a few letters (id. at 15-16) "because he's a good person and he loves me" (id. at 11). Mr. T. apparently works as an HIV counselor at Greystone Health Center, and also serves as a Facilitator with the Youth at Risk Project in the Youth Term Program (see Levinson Report [dated 4/15/02], supra). Ms. B. described his work as dealing with children who must attend programs that serve as alternatives to prison (B. Testimony, Transcript [4/16/02], at 13).
Only after the hearing did this court receive documents regarding Mr. T.'s State Central Register check and criminal history report which this court originally ordered on the record on February 5, 2002, and again by a letter dated May 8, 2002 (see Court Endorsement Sheet [dated 2/5/02] and Court Atty Ltr [dated 5/8/02], File).
By cover letter dated May 14, 2002, Ms. B.'s attorney submitted a report from the State Central Register dated May 20, 2000, which reflected that Mr. T. was not found to be the subject of an indicated case of child abuse or maltreatment under the name Hildred T. (see SCR Ltr [dated 5/20/00], File). This report did not, however, include a check of the four other aliases Mr. T. has apparently used over the years.
Indeed, the criminal history check conducted by the Division of Criminal Justice Services (DCJS) found that Mr. T. has an extensive criminal history using the following names: Hildred N. T., N. T., James J., Hildred N., and John S. G..
[*12]
More specifically, the DCJS report showed a February 24, 1989 conviction for (1) criminal possession of a weapon in the 2nd degree (for which Mr. T. received a sentence of 90 months to 15 years), and (2) manslaughter in the 1st degree (for which he received a sentence of 9 to 18 years) under the name Hildred N. T.. Mr. T. was admitted to the Downstate Correctional Facility on March 2, 1989, and released on December 10, 1999 (DCJS Repository Inquiry [dated 5/15/02], File). According to the report, both of these convictions were "presumptively disqualifying crimes" which required that, pursuant to Social Service Law section 378-a(e)(1), any application on Mr. T.'s part to apply as a foster parent or adoptive parent "MUST BE DENIED" and that any certification he already possessed as either a foster or adoptive parent "MUST BE REVOKED" unless he could demonstrate that the denial or revocation would "create an unreasonable risk of harm to the physical or mental health of the child" and that either approval or continued approval/certification would "not place the child's safety in jeopardy and will be in the best interests of the child" (OCFS Criminal History Report [dated 3-/21/02], File). These convictions also required the agency to complete a safety assessment of the conditions in the household and take all appropriate steps to protect the children in the home, which could include removal.
The report contained information that Mr. T. had also been (1) convicted of
criminal possession of a weapon in the 3rd degree on February 24, 1989 under the name Hildred N. T. (for which he received a sentence of 52 months to 7 years), (2) charged with homicide on November 10, 1969 under the name N. T. (no disposition was reported), and (3) charged with robbery in the 1st degree on April 23, 1976 under the name John S. G. (no disposition was reported). According to the report, these convictions /charges represented "potential presumptive disqualifying crimes" that required further review to determine whether they would also be considered presumptively disqualifying crimes (id.).
This court never received any follow-up information regarding this review process, or any indication that a safety assessment was completed.
The report also listed "additional non-potential presumptive disqualification conviction(s) and/or charge(s)": (1) a February 24, 1989 conviction for attempted criminal possession of a controlled substance in the 3rd degree under the name Hildred N. T. (for which he received a sentence of 90 months to 15 years), (2) a June 10, 1969 charge for possession of 25 or more cigarettes containing a dangerous drug under the name N. T. (no disposition was reported); (3) an October 8, 1972 charge for burglary in the 3rd degree under the name James J. (no disposition was reported); and (4) an April 23, 1976 charge for criminal possession of a weapon in the 4th degree with intent to use under the name John S. G. (no disposition was reported).
The court's own DCJS repository inquiry revealed that Mr. T. was also arrested on August 9, 1969 on charges of possessing 25 or more cigarettes containing a dangerous drug and possession of a hypodermic instrument. These charges were dismissed on July 17, 1970. Mr. T. was also arrested on August 24, 1967 on charges for possession of narcotics, but these charges were dismissed as well. On June 13, 1967, Mr. T. was arrested for an unspecified misdemeanor.
[*13]
In addition, the DCJS repository inquiry revealed that Mr. T. had been admitted to the Elmira Reception Center on March 23, 1970 under the name N. T.. It is not entirely clear for which crime he was incarcerated,[FN12] but he was released and put on parole on July 7, 1972. His parole was subsequently revoked due to a violation on August 15, 1985, and he was placed into Sing Sing Correctional Facility on October 2, 1985. He was re-paroled on February 7, 1986, and discharged from parole on June 23, 1986. As related above, he was incarcerated again on March 2, 1989 due to the convictions for manslaughter and criminal possession of a weapon in the 2nd and 3rd degree, and was not released until December 10, 1999.
This court also received an undated document labeled "notice of exception to presumptive disqualification (and removal)" which informed Mr. T. that with respect to his application for certification or renewal as a foster parent or adoptive parent, DCJS had determined that he was convicted of a presumptively disqualifying crime (a felony conviction for a "crime involving violence, including rape, sexual assault, or homicide, other than a crime involving physical assault or battery") and, thus, that pursuant to Social Services Law section 378-a, his application "will be denied or your existing certification or approval will be revoked, UNLESS YOU DEMONSTRATE that: (1) denial or revocation will create an unreasonable risk of harm to the mental or physical health of the child, and (2) certification, approval or renewal will not place the child's safety in jeopardy and will be in the best interests of the child. Furthermore, IF YOU FAIL TO DEMONSTRATE this, then our agency is required by Social Services Law section 378-a to remove any foster child[ren] placed with you" (File [emphasis added]).
While it is unclear to this court whether Mr. T. has actually applied for certification as a foster parent, it is clear that he is living in the home with Ms. B. and the child on a daily basis, and that the three of them spend significant amounts of time together. This court is more than troubled with the agency's cavalier attitude regarding Mr. T.'s history by first failing to bring Mr. T.'s existence to the attention of this court, and then by failing to take any measures that demonstrate concern for the child's well-being by, at the very least, completing a safety assessment. This court is left to conclude that the agency believes that the DCJS report finding that Mr. T. has committed a presumptively disqualifying crime that requires removal of the child simply does not apply to this case because Mr. T. has apparently not actually applied to become either a foster or adoptive parent, and that no action of any kind is warranted.
At the hearing, the Law Guardian submitted Mr. Levinson's report which found "no obvious or apparent risks of harm or danger to the subject child" (Levinson Report [dated 2/5/02 and 4/15/02], supra), and stated on the record that he was supporting the adoption petition based on the child's wishes (Law Guardian's Testimony, Transcript [4/16/02], at 16).
The hearing was scheduled to continue on December 19, 2002, but on that date Ms. B., [*14]without any explanation, failed to appear. Based on the full record presented, this court denied the adoption petition with prejudice and ordered the agency to file an immediate review pursuant to Family Court Act section 1055-a.
On January 8, 2003, the agency requested "an understanding as to [this court's] ruling" (Agency Ltr [1-8-03], File). The instant decision followed.
Pursuant to Domestic Relations Law section 114, courts shall make an order approving an adoption petition "if satisfied that the best interests of the adoptive child will be promoted thereby." As stated in the commentaries to this section, "the court's function is simply not to rubber-stamp adoption petitions but, instead, is to act as parens patriae and to approve the adoption only if the court is convinced that the child's moral and temporal interest will be promoted by the adoption" (Scheinkman, Practice Commentary, McKinney's Cons Laws of NY, Book 14, DRL, Art VII, §114, at 155).
The task of determining whether a particular individual would be an appropriate adoptive parent for a child requires a careful and thoughtful analysis of the household into which a child will become a permanent member. In reviewing the instant petition, it has been extremely frustrating for this court to be put into the position of being forced to repeatedly ask for information from the agency which should have been submitted as part of the adoption file;[FN13] to discover the existence of and obtain court records from other counties involving Ms. B., her boyfriend, her children, and relatives, which ranged from juvenile delinquency matters and criminal court cases to custody cases and family offense proceedings; and to hold a hearing to attempt to shed light on issues where the court received conflicting information from Ms. B., the agency, the social worker, and records from other courts.
After taking considerable effort to review all of the documents submitted, it has become clear to this court that all of these reports and records, as well as the sworn testimony of the Petitioner create an overwhelming record that it is not in the subject child's best interest for this court to approve finalization of the adoption petition.
[*15]
The home in which Ms. B. grew up and that in which she currently resides have been
filled with violence, crime, and drug addiction. Ms. B.'s father was apparently a drug addict and spent the majority of Ms. B.'s childhood in and out of prison. All but one of Ms. B.'s siblings have had problems with substance abuse, and her husband was a drug addict. She has been involved in at least 2 romantic relationships with men who have physically assaulted her (Mr. N. and her husband), and filed for an order of protection against her current boyfriend, Mr. T., which she later withdrew after 5 or 6 court appearance. Lasean, one of her three biological children, was incarcerated on drug charges for a period of 3 years, and she admitted to burning his bed when she learned he was selling drugs. She also admitted that her child Spencer had been addicted to drugs and that she had stabbed him with a knife when he was high on angel dust and he attempted to hit her. Until this court requested additional information, the adoption file did not even mention the existence of the four children (Walter, Lamont, Charlene, and Lorraine) over whom Ms. B. had obtained custody. Of these children, there is an indicated SCR report against Ms. B. for hitting Charlene after she came home late from a date with her boyfriend, who was allegedly a drug dealer, which resulted in bruises and lacerations, and which Ms. B. has variously stated was accidental, a mere slap, or an intentional attempt to "knock[] the hell out of her" (Probation Report [dated 10/28/93], at 3). She does not know where Walter currently resides; she has obtained an order of protection against Lamont who abused drugs and had an extensive juvenile delinquency history while residing with Ms. B.; and she asked Lorraine to leave her home when Lorraine became pregnant, allegedly by a drug dealer. In addition, Ms. B. called in a report with the State Central Register against her son Lasean and his girlfriend, Jacqueline L., alleging that they were medically neglecting their baby and engaging in sexual intercourse while holding the baby, thus causing the child to be shaken. Adding to the picture of disorganization and discord in this household is the fact that Ms. B. is living with a person who was convicted of a serious, presumptively disqualifying crime for which he served about 10 years in prison and is still on probation; has a series of other arrests and convictions on his record which span a period of about 20 years, some of which resulted in prison time; has daily, extensive contact with the subject child; and who was never once mentioned by the agency until this court appointed a Law Guardian who investigated Ms. B.'s background and brought Mr. T.'s existence to the attention of this court.
All of these facts leave this court with no doubt that the agency failed to adequately monitor the situation in Ms. B.'s household. There is also no doubt that finalization of this adoption  in which case the agency would be divested of the responsibility for caring for this child  is not in this child's best interests. Indeed, no matter how excruciatingly closely these records are parsed, they ultimately present a tangled mass of half-truths and deliberate lies.
 Moreover, having had the unique opportunity to closely observe Ms. B.'s affect and demeanor during her testimony, this court finds without hesitation that the testimony was neither candid nor credible, and simply continued Ms. B.'s years-long pattern of choosing to answer questions with little regard for the truth.
 This court reiterates that its decision has been based upon an extremely careful [*16]consideration of the full record of the Petitioner's application, and not upon her failure to appear on the date scheduled for the continued hearing.[FN14]
This court is not unaware that the child is now a teenager who has resided in this home for over 10 years and has stated his wish to the Law Guardian that he be adopted by Ms. B.. However, this court believes it would be a dereliction of its duty to simply approve the petition given the concerns raised herein (see DRL §114). To do so would be to divest the agency of the responsibility to monitor conditions in this home and take action to protect this child. To do so would be to accept that chaos, lies, crime, and confusion are the best life can offer this child, and would place an official imprimatur on what this court deems to be an unsatisfactory adoptive home.
Accordingly, the adoption petition is hereby denied with prejudice.
If it has not already done so, the agency is hereby directed to schedule a Family Court Act 1055-a review forthwith, address each of this court's concerns as detailed in this decision, determine whether this child's best interests require removal from Ms. B.'s home, and implement corrective action accordingly.
This constitutes the decision and order of this court.
ENTER:
Hon. Susan R. Larabee, J.F.C.
Decision Date: April 30, 2003
Footnotes

Footnote 1:A one-page update was dated February 9, 2001.

Footnote 2:Lasean appears to have been incarcerated from 1996-1999 (see Probation Report [dated 3/22/01], File).

Footnote 3:It should be noted that both the petition and the adoption order incorrectly state that Ms. B. is not the subject of an indicated report. 

Footnote 4:It should be noted that the homestudy had only referred to Ms. B.'s biological son as "Sean;" therefore, it was not clear to this court what relationship Ms. B. had to the "Lasean" named in the SCR report.

Footnote 5:This court asked the following questions:
9. Included in the file is information involving an apparently indicated case against a Lasean B. in 1996. Who is Lasean? What was the outcome of that case? Where is Disean L. now?
10. Please provide any and all records/reports/notes involving the foster mother's indicated case. Please provide an affidavit from the social worker who handled this case. What happened to the children who had been in the home in 1993, including Charlene, Lamont, and Walter? Who were these children? Who else was residing in the home at that time?

Footnote 6:This court therefore wrote another letter to the agency which, among other things, stated that the agency's response was not satisfactory and reiterated the request for additional records regarding the indicated case (see Ct Atty Ltr [dated 8/28/01], File). No response was ever provided.

Footnote 7:The caseworker did not explain who Lamont, Walter, and Charlene D. were, and incorrectly states that Lorraine D. is Ms. B.'s biological daughter. Court records make clear that these four children were all the children of Ms. B.'s half-brother, Lamont D., Sr.'s, wife. Lamont, Walter, and Charlene are Lamont D., Sr.'s biological children.

Footnote 8:The SCR report also stated that Charlene had gone to live with her grandmother the night the incident took place (see CPS Investigation Summary, supra).

Footnote 9:It is not clear why Ms. B. had to provide these monies to the Social Security Administration.

Footnote 10:The homestudy indicated that Ms. B. was employed by the New York City Housing Authority (NYCHA) as an "associate property manager" and as a "psychiatric technician" at Children's Village. Ms. B.'s job with NYCHA allowed her to come home by 4:30 p.m., but her position at Children's Village required that she work from 3 p.m. on Friday to 7 a.m. on Saturday, then 4 p.m. Saturday to midnight, and then 7 a.m. to 3 p.m. on Sunday. During these weekend hours, the child was cared for by "Jackie L." (Homestudy, at 11, File). Ms. B. has since stopped working at Children's Village (see Transcript [4/16/02], at 12).

Footnote 11:This court's request to the City Court of Yonkers resulted in the denial of any information related to Ms. B.'s domestic violence case against Mr. T. (Docket No. 00-4373) based upon Criminal Procedure Law section 160.50 ("Upon the termination of a criminal action or proceeding against a person in favor of such person,...the record of such action or proceeding shall be sealed").

Footnote 12:The two crimes for which Mr. T. was arrested under the name N. T. were for homicide and possession of 25 or more cigarettes containing a dangerous drug, both in 1969.

Footnote 13:In fact, this court never received any response to this court's second letter to the agency dated August 28, 2001 requesting (1) information to address continuing problems with the DRL 111 affidavit, (2) records involving Ms. B.'s indicated case, and (3) a detailed assessment provided by the caseworker as to whether it is in the child's best interests to be adopted by Ms. B. given her guilty plea to disorderly conduct, the fact that after the subject child began residing in the home Ms. B. obtained an order of protection against another child residing in her home, Ms. B. became the subject of an indicated case, and she made a report to the State Central Register against one of her biological child who also resided in her home (Ct Atty Ltr [dated 8/28/01], File).
Moreover, despite this court's clear directive on December 19, 2002, it appears that the agency has still not scheduled a FCA 1055-a review.

Footnote 14:Ms. B. failed to appear on December 19, 2002 for continuance of the hearing which had begun on April 16, 2002. Ms. B.'s attorney had no explanation for her absence.